Good morning, your honors. Good morning. I can tell that's a little high. I notice some people... Am I too short? Well, no, I'm too short, but I notice some people pushing up and down. There, that's better. That's good. Okay. That's very helpful. That's that. Thank you. Now you're perfect. All right. Good morning again. I'm here on behalf of the appellate, Mr. Mercado. Say your name again, please. My name is Lana Cece Glenn. Okay, thank you. And I represent the appellate. And I didn't know exactly how the court wanted me to proceed, so I decided that perhaps the best way to do this would be, first of all, to talk to the court about the issue of entrapment. Well, yeah, I think on the entrapment issue, obviously there's no dispute that the jury was properly instructed, correct? There is no dispute. All right. So then, you know, we have to, you know, in going through that, I guess the appellant's theory of inducement was some, it says, through threat and a coercive loan, and that was disputed by the other side. And then he has the problem of that basically a casual acquaintance from an illegal cockfighting match. Mr. Mercado was able to persuade Mr. Perales to engage in a drug deal of eight pounds of 95% pure methamphetamine with the informant, a man that Mr. Mercado himself had only just met. So the jury's with all of this, so why isn't, you know, they heard it. They were properly instructed. They didn't believe it. They didn't go for it. So you are narrowing it down to an issue of credibility. Well, it's not just credibility because juries resolve those issues, so it's a question of when we review it by the standards on appeal, you're pushing a pretty tough rock uphill on that. Well, and I'd like to do that because part of the push uphill is based on the pre-sentence report and the recommendations made to the court in terms of the sentencing. And that was that if you look closely at the pre-sentence report, the main thrust of them finding that Mr. Mercado should have an offender score of 38 and encouraging the judge to sentence him to 200 is giving the impression that this all occurred in one day and that within an instant after a very trusting relationship between Mr. Mercado and Mr. Perales, the main supplier, that that arose as a result of the familiarity with being involved in criminal behavior related to crime. However, if you look closely at the report, Mr. Mercado has no criminal record and he does not drink and he does not use drugs, and he merely made the arrangement of the contact between the informant and Mr. Perales. And you're correct, Your Honor, very correct, in that they're only relationships. I can't, as we speak, make an arrangement for eight pounds of 95% pure methamphetamine. And neither could I. The inference from that is that you've got to, you know, and I think you had a drug expert was qualified as an expert testify that that's not the type of deal that someone can make without developing a relationship of trust and establishing themselves to have some bona fides in the trade, as it were. Well, and I think that the argument was that that operative trust level was not a result of prior drug involvement. It was the result of them knowing one another at cockfighting. But I would like to say that the one very true fact also in the report is that Mr. Mercado is a gambling addict. And the agents were notified by Mr. Garcia, the CI, that he had found someone, which is what his job is to do, who he could, he thought could provide information in order to get Mr. Perales, Mr. Mendoza, and Mr. Mercado. Well, is there any undisputed evidence that the government informant or agents knew of Mr. Mercado's peculiar susceptibility to inducement, that being the gambling, or is that a disputed issue that the jury basically, we have to assume, didn't believe? I think it's a disputed, I think it's very disputed as to whether or not Mr. Mercado was in fact rightfully induced or that he, it's, I'm saying he was induced by the CI. I'm also saying that if you look at the testimony of all of the agents, Mr. Garcia, who was the CI, he made two to 15 phone calls, which he testified to. Anywhere between two to 15, he was encouraged, he knew where he lived. He finally admitted after first denying that he did know where he, Mr. Mercado lived. He first denied making him a loan, and then he recanted that and said, yes, he did loan him money because he was broke at the casino, and Mr. Mercado wanted to pay back that money. And Mr. the CI was so incredibly inconsistent in his testimony, as you will see here, looking at the government's excerpts, SCR 61, 62, I would ask you to look very closely at 73, 74, and also at 76, 77, where there were five or six different encounters before Mr. Mercado even said maybe he could. So that's the first thing that I wanted to mention. The second thing that I wanted to mention is that the CIA was never involved in setting up this CI who was trying to work off time. They had absolutely no knowledge about Mr. Mercado being involved in any, no record of any criminal conduct, and no record of any prior involvement with drugs. They'd never heard of Moise Mercado until the day it happened, and that's from Detective Bailey, who set up the surveillance. Detective Atkins had never, had no contact with, he didn't know Moise Mercado. Detective Stedman had no knowledge of Moise Mercado until the day of the transaction. Detective Mitchell Vian had no information or any report that he could, of any illegal activity at Moise's residence. None of the agents even that got him involved with Garcia, Agent Barrett, he'd never heard of him. And that is a good point in his favor, but unfortunately it's also undisputed what the amount of the dope was and the percentage of it. So the jury's entitled to look at all of those and, you know, I mean, they could, you know, unfortunately law enforcement doesn't know everyone that's dealing drugs either. And so the fact that they don't know of someone, I mean, the jury's entitled to make that resolution. And I'm sure, as counsel did in the lower court, you would argue, well, hey, if this guy was such a big dealer, why didn't you know about him? And that might have been why he could have won there, but they apparently didn't believe that. Well, I am representing that Mr. Mercado was an otherwise law-abiding citizen who was induced by persuasion and by fear and pressure and by threat to his family to commit a crime that he otherwise would not have committed, and that the court should have taken into consideration the fact that he was a minor player. It was Mendoza, the other co-defendant, who went to get the additional pounds of... If you'd like to reserve the balance so you can respond to what the government says. Yes, I would. Thank you. Thank you. Good morning. Your Honor, the government believes that there are two errors with the defendant's approach to the case. First, while the defendant cites the correct standard of review for the first two issues, that being to view the evidence in the light most of the time, the defense essentially adopts the defendant's testimony and assumes the truth of it in argument, when in fact the defendant's testimony was specifically contradicted by the agent's testimony and by the confidential informant. Well, in appellant's defense here, Mr. Mercado has no prior criminal drug convictions, which is pretty unusual. I mean, a lot of these cases we see people that have been dealing forever when they're dealing at this sort of level it's not clear from the record what, if anything, Mr. Mercado stood to gain. It doesn't say what, you know, that he got a certain cut of it or, you know, of the money. We don't know that. So what's the evidence that the government relies on to say that Mr. Mercado was himself actively engaging in drug dealing? Yes, Your Honor, and that goes to the second point, that while the appellant's excerpt of record includes information that it doesn't specifically cite, it omits important information that ties the defendant and dresses the issue both of inducement and of an existing propensity. Specifically with Detective Aiken's testimony, while it's in the defendant's record, it's not indicated in briefing that the defendant goes to the convenience store to get the item consistent with the bleach that has been discussed on the wire as a dealer in the community. It's not indicated in the court's record that the defendant is using the methamphetamine. There's some discussion about how that can be added and then based on the reaction of the Clorox bleach to the methamphetamine you can determine quality. With respect to Detective Bailey answering the court's earlier question about the lack of knowledge of the defendant as a dealer, I would include the fact that because Mr. Mercado's residence is in Sunnyside or is outside of Sunnyside and he's a Sunnyside officer, he's not necessarily going to hear about it. Again, addressing the issue of whether or not, why we haven't heard about this defendant, Special Agent Barrett in the record says, and I quote, it's a covert drug culture. They try their best to hide their identity, their property and their involvement in drugs itself. There's also testimony from other officers that the fact that you haven't heard about someone doesn't mean that they're not dealing drugs, the inference being they're good and they have shielded themselves. There's also discussion about the confidential informant who before serving in that capacity was himself a broker between the  Again, identifying that there is some stake in it, although as the court points out, not explicit. But most telling is the supplemental excerpt of record with respect to Officer Garcia. And in the supplemental excerpt, there is monitoring of the wire which shows both the defendant's existing propensity to deal and to withhold as much as we want from these guys. Talking about the methamphetamine, showing that this isn't the first time that he's done it before. Also, he assuages the concerns of the confidential informant, both at the restaurant and at the body shop while they're waiting for the deal. The actual deal he's wearing a wire? Yes, that's correct. And Agent Garza in his testimony, specifically in the supplemental excerpt of record 33 through 43, discusses the defendant's statements on that wire as he's monitoring it. Including things like the defendant saying this is a good place for this to happen. These things take time as they're waiting for the methamphetamine to be delivered. The defendant's awareness of quantity and the fact that the drugs are nearby but will be brought. And the defendant's statement to the confidential informant, you've got to trust us as much as we need to trust you. And finally, the defendant looks forward to a future deal with this confidential informant indicating next time it won't be this way, you call up and it will be ready. To address the court's first two points to appellant, with respect to the loan that is contested testimony, the confidential informant testified that it was a $100 loan, not $200 and was paid back the same evening from the gambling winnings. With respect to the idea that the government took advantage of a known condition, in this case the gambling and financial straits, the confidential informant was asked and answered that he wasn't aware of a gambling problem. So in sum, it's the government's contention that as to the first two issues, when viewed in the light most favorable to the government, the jury was correct in rejecting the defense of entrapment and that there was sufficient evidence under aiding and abetting, which is charged in the indictment and the jury was properly instructed, as to the defendant's participation in the possession with intent. Finally, dealing with the issue of the denial of the minor or minimal participant, we simply submit that the district court judge got it right and that his point that you don't just arrange for eight pounds of 95 percent pure methamphetamine without having some history, some involvement, that makes you more in the heartland of the player than you would in the extreme case where the minor or minimal participant would be reasonable. And that's buttressed by the trial testimony of the officers saying that 95 percent pure methamphetamine is consistent with this level of dealing, whereas once the methamphetamine gets to the street, you're liable to see it in the 50 to 60 percent purity ratio. I have nothing further unless the court has questions of me. Thank you. The only thing I have to say in response on behalf of Mr. Ricardo is he had a second grade education from Mexico. He's never touched the drugs, he's never had a drug conviction, as opposed to his codefendants. Mr. Perales, who got 168 months, pled guilty. He had a prior conviction for having dealt a distribution of five pounds of pure meth. And the other defendant, Mr. Mendoza, received 120 months, and he pled guilty. And the agent had contacted Officer Barrett, who then contacted Atkins, in order to make sure that Mr. Mendoza was free to work off time for prior convictions that he had himself. And finally, I think that it's the position, in fact I know it is of Mr. Ricardo, that he of all three defendants was the least culpable with respect to this transaction. And it's a huge amount, there's no question. We review this, though, for reasonableness, and there are little sayings out on the street, like the first to squeal gets the deal and all of those type of things. So the fact that the other people got less, I mean, we really have to review this for reasonableness, correct? I understand that, Your Honor. And he had a jury trial, they entered pleas, I mean, there's a lot of calculus that goes into that. Yes, there is, and I don't dispute what you are saying. The only other thing I would like the Court to look at is the inconsistencies, again, of the testimony that counsel for the government spoke of in terms of Mr. Garza speaking about Mr. Garcia, and in terms of what Mr. Perales, who didn't testify, was involved in according to the PSI that's under seal. All right, thank you for both of your arguments, this matter will stand submitted.
judges: Canby, Thompson, Callahan